**UNITED STATES of America,**

v.

**Sergey ALEYNIKOV, Defendant.**

**No. 10 Cr. 96(DLC).**

United States District Court,
S.D. New York.

March 16, 2011.

Joseph P. Facciponti, Rebecca A. Rohr, United States Attorney Office, New York, NY, for the United States.

Kevin H. Marino, John D. Tortorella, John A. Boyle, Marino, Tortorella & Boyle P.C., Chatham, NJ, for Defendant.

*OPINION & ORDER*

DENISE COTE, District Judge.

## Table of Contents

Background ............................................................... 51

 I. Procedural History ................................................ 55

Discussion ............................................................... 55

 I. Sufficiency of the Evidence ....................................... 55
 A. Intent to Steal Goldman Sachs' Proprietary Code ...................... 56
 B. Intent to Benefit Himself or Teza and Intent or Knowledge of Injury to Goldman Sachs ........................................... 58
 C. Evidence of a Market for the Stolen Code ............................ 59

 II. Motions for Reconsideration ...................................... 60
 A. Goldman Sachs' Trading System is a Product in Interstate Commerce .......................................................... 60
 B. The Stolen Source Code is a "Good, Ware or Merchandise" .............. 61
 C. Aleynikov's Post–Arrest Statements ................................. 61

 III. Evidentiary Rulings ............................................. 61
 A. Exclusion of Bail Hearing Statements ............................... 61
 B. Cross Examination of McSwain ...................................... 63
 C. Cross Examination of Yanagisawa and Schlesinger ..................... 66
 D. Refusal to Strike Government Exhibit 108 ............................ 66
 E. Wheel of Fortune Rule 404(b) Evidence .............................. 67
 F. Government's Expert Witnesses ...................................... 68
 G. Statements of David Viniar ......................................... 71
 H. References to Civil Remedies ....................................... 73

 IV. Discovery of the Entire Goldman Sachs Trading System ............. 76

 V. Government Summation ............................................. 79

 VI. Closure of the Courtroom ......................................... 79

 VII. Judicial Impropriety ............................................ 81
 A. Objections ......................................................... 81
 B. Sidebars ........................................................... 82
 C. Display of Stricken Question ....................................... 82

Conclusion ............................................................... 83

Defendant Sergey Aleynikov ("Aleynikov") was charged in a three-count Indictment filed against him on February 11, 2010. The Indictment charged that Aleynikov, a former computer programmer for Goldman Sachs, stole Goldman Sachs' proprietary computer source code near the end of his employment with the firm, intending to use the stolen code at his new job with Chicago-based Teza Technologies, LLC ("Teza"). Trial on two of the counts began on November 29, 2010. The jury reached its verdict on December 10, finding Aleynikov guilty on both of the counts. Aleynikov has now moved pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure to set aside the verdict and to dismiss the Indictment or, in the alternative, for a new trial. For the following reasons, the motion is denied.

## BACKGROUND

Viewed in the light most favorable to the Government, the evidence presented at trial established the following. Goldman Sachs is a New York-based investment firm that provides financial services worldwide. Goldman Sachs is one of the industry leaders in "high frequency" trading on securities and commodities markets, including the New York Stock Exchange ("NYSE") and the NASDAQ Stock Market ("NASDAQ"). High frequency trading is distinguished by the fact that trading decisions are made by computer programs, which rely upon complex mathematical algorithms to process data on market developments and to execute trades rapidly. High frequency trading systems take data from the exchanges, translate it, apply a decision logic to make trading decisions, and through a messaging protocol route those decisions back to the exchanges for execution.

Goldman Sachs goes to great lengths to protect and enhance the competitiveness of its high frequency trading system, which was acquired in large part when the firm purchased the Hull Trading Company in 1999 for the substantial sum of $500 million. The superiority of Goldman Sachs' system rests at least in part on the speed and accuracy with which it is capable of executing trades. To maintain and enhance the performance of its high frequency trading system, Goldman Sachs employs a group of twenty-five computer programmers at an average salary of $275,000 per employee in 2008 and 2009.

Firms in the high frequency trading business are extremely secretive about the various aspects of their trading systems. Goldman Sachs does not license, sell, or distribute components of its high frequency trading system. Indeed, Goldman Sachs has implemented many security measures to maintain the secrecy of its high frequency trading system. In order to protect the firm's computer systems from intrusion, the firm maintains a firewall. It monitors its employees' use of internet sites and also blocks access to certain websites. A banner that appears whenever employees log in to their computers advises them of prohibited uses of the internet and accepted behaviors. Access to Goldman Sachs' buildings is restricted to employees with proper identification cards; access to firm computers is also restricted. Only those few employees with administrative access, including Aleynikov at the time of his employment with the firm, are permitted to use USB flash drives.

A competitor of Goldman Sachs' would have several advantages if it had access to the computer source code comprising Goldman Sachs' high frequency trading system. That competitor would be able to avoid expending the substantial invest-

ments in time and resources necessary to develop the infrastructure of the trading system. It is estimated that it would cost a new entrant in the industry $10 million and two years to develop its own high frequency trading system from scratch. A computer programmer is expected to write between ten to twenty-five lines of code per day, and a high frequency trading system requires hundreds of thousands of line of code. Goldman Sachs believes that the proprietary components of its high frequency trading system are state-of-the-art and would enable a business entering the market to eliminate Goldman Sachs' competitive advantage. Although there are commercially available substitutes for some of the components of Goldman Sachs' high frequency trading system, Goldman Sachs' components are superior.

Goldman Sachs does use publicly available computer source code, known as "open source" code, to assist with certain functions related to its high frequency trading system. Open source code is readily available to the public online at no cost. For example, much of Goldman Sachs' high frequency trading system runs on the operating system Linux, which is composed completely of open source code. Every effort is made to ensure that the open source code used by Goldman Sachs computer programmers is segregated from Goldman Sachs' proprietary code. Thus, the firm maintains a separate directory for the storage of open source code.

From May 7, 2007 until June 5, 2009, Aleynikov was employed as a computer programmer for Goldman Sachs, engaged in supporting high frequency stock trading. Aleynikov's employment contract provided that he would receive a base salary of $150,000, with the possibility of an annual bonus of $120,000. As a condition of his employment, Aleynikov was required to sign a global information security policy, which provided in relevant part that he would

hold all confidential and proprietary information and materials in strict confidence and, except for the above authorized uses, will not, nor [will he] permit any agent to give, disclose, copy, reproduce, sell, assign, license, market or transfer confidential and proprietary information and materials to any person, firm, or corporation . . . .

The security policy further provided that

You irrevocably assign to Goldman Sachs, its successors and assigns, and Goldman Sachs shall have exclusive ownership rights, including, without limitation, all patents, copyright and trade secret rights, with respect to any work, including, but not limited to, any invention, discoveries, concepts, ideas or information, conceived by you in the course of your employment with Goldman Sachs, and all documents, data, and other information of any kind including, incorporating, based upon or derived from the foregoing, including reports and notes prepared by you. Such work will be the property of Goldman Sachs, shall be considered a work made for hire and may not be used for any purposes other than the benefit of Goldman Sachs.

In 2008, Aleynikov received an offer of employment from UBS, another investment firm, and sought to resign his position at Goldman Sachs. Aleynikov was persuaded to remain on at Goldman Sachs in exchange for a raise in salary to $400,000. In late April 2009, Aleynikov again resigned his position, citing an offer of $1.2 million from a competitor in the high frequency trading field. This time, Goldman Sachs decided not to match the competing offer. Aleynikov did not disclose the identity of the competitor, Teza, to his colleagues at Goldman Sachs, but he

did report to Goldman Sachs during his exit interview that his new employer was paying him $800,000 more than Goldman Sachs. Aleynikov was allowed to remain at the firm for five more weeks, to ensure a smooth transition.

Teza is a Chicago-based firm founded in March 2009 to engage in the high frequency trading business. Teza's founder, Mikhail Victorovich Malyshev ("Malyshev"), was the managing director of the high frequency trading group at the Chicago hedge fund Citadel Investment Group ("Citadel") prior to starting Teza. Malyshev left Citadel in February 2009; in 2008, his team earned Citadel profits of approximately $1,145,000,000, for which Malyshev was compensated $75 million in cash. Malyshev testified that his goal in starting Teza was to "build the best high frequency company in the world." Teza did not plan to trade options initially. Malyshev and his partners were looking to recruit experienced programmers such as Aleynikov who would be able to build Teza's high frequency trading platform.

Aleynikov drove a hard bargain in salary negotiations with Malyshev; in an email of April 12, 2009, Aleynikov rejected Malyshev's offer of a total compensation package of $800,000, informing him that he expected his total compensation at Goldman Sachs "to be between 600 to $700,000." Ultimately, Malyshev acceded to Aleynikov's demand for a salary of $1.2 million. Malyshev initially proposed that Aleynikov would take the title of "Senior Platform Engineer," but the title was changed to "Executive Vice President, Platform Engineering" at Aleynikov's urging. Aleynikov was to serve as a developer of Teza's high frequency trading platform.

Having recruited Aleynikov and several other computer programmers to start work at Teza in the summer of 2009, Malyshev was eager to begin the process of building Teza's high frequency trading platform. An email dated May 31, 2009 and sent by Malyshev to Teza's three founding partners, three employees, and four prospective employees, including Aleynikov, with a subject line of "Let's move fast," implored Teza's employees to work quickly so that the firm would be able to start trading on December 1, 2009. Malyshev's email added, "We are up against experienced and very wealthy competitors that are currently way ahead of us and using their cash from last year to buy their way out of tougher times ahead. We are better and smarter, but we have to be moving full speed ahead to even catch up with them."

Within days of learning of a job opportunity at Teza, Aleynikov began to upload data from Goldman Sachs to a so-called "subversion" website, with an address of svn.xp-dev.com. These uploads began on March 30 and ran through April and May, 2009. And on April 7, Aleynikov created a document on his home computer called "Teza.doc" which was essentially a blueprint for designing a high frequency trading system. Aleynikov undertook large uploads of source code on June 1, June 4, and June 5, Aleynikov's last day of work at Goldman Sachs. Aleynikov combined the source code, compressed it, encrypted it, and then uploaded it to the subversion website. On June 5 alone, Aleynikov transferred 3,639 unique files containing over 500,000 lines of source code. The website, which was registered to a German server, offered services to anyone who wanted to put code on the open source repository. Aleynikov also deleted his encryption key and attempted to erase his bash history, which is a list of commands executed by a particular user on a UNIX/Linux machine; the bash history was later recovered by the Goldman Sachs information security team.

The source code that Aleynikov uploaded to the subversion website comprised large portions of Goldman Sachs' high frequency trading infrastructure. The code stolen by Aleynikov contained components for the following: connecting to the various securities exchanges; reading the incoming price data; pricing algorithms; trading strategies; the infrastructure for routing the trading decisions back to the exchanges; and applications for monitoring the performance of all of these intricate parts of the trading system. In addition to proprietary source code, Aleynikov also took proprietary documents that were marked at the trial as Government Exhibit 108. This series of documents included schematics describing the connections between Goldman Sachs' computer system and the various securities and commodities exchanges and evaluations of operating systems and products for high frequency trading systems.

After uploading Goldman Sachs' proprietary source code to the subversion website, Aleynikov downloaded the same code to his home desktop on June 10. Aleynikov modified some of the downloaded source code to remove the document header identifying the code as belonging to Goldman Sachs. Then, on June 25, Aleynikov transferred thirty-one files from his home desktop to Teza's servers. The transferred files included portions of Order Book Builder ("OBB"), an application that processes price information from various securities exchanges-the files "AtomicIntTest" and "DenseMap."

Aleynikov's uploads to the subversion website attracted the attention of Goldman Sachs' security team on June 29, 2009; the firm promptly alerted authorities. On July 3, Aleynikov was arrested at Newark airport upon his return from a meeting at Teza's offices in Chicago. Federal Bureau of Investigation ("FBI") agents conducted a search incident to arrest and uncovered a thumb drive in Aleynikov's pocket and a laptop, both of which contained Goldman Sachs' proprietary source code. Agents also found the proprietary code on Aleynikov's home desktop computer.

In response to questioning by FBI agent Michael McSwain ("McSwain"), Aleynikov initially stated that the source code could only be found on his home desktop. He later admitted that the source code was also on his laptop and the thumb drive found on his person at the time of his arrest. In a written post-arrest statement, Aleynikov averred that he "created a tarball [a device used to compress computer source code] in a[n] effort to collect open source work on Goldman Sach's server to which I had an account." Aleynikov further told McSwain that he "wanted to take the open source information to review it like a person would in college, to go back and read a paper." Although Aleynikov initially stated that he had taken only open source code from Goldman Sachs, he later recanted and admitted that he had intentionally collected *both* open source code and proprietary code, with the idea of separating out the open source code once he had downloaded it to his home computer.

Evidence offered at trial also established that on December 22, 1997, the United States District Court for the Central District of California permanently enjoined Aleynikov and two other individuals from infringing on the trademark of the Wheel of Fortune game show. According to the complaint filed in the case, which was admitted into evidence at trial, the injunction stemmed from Aleynikov's development of a website which imitated the look and feel of the Wheel of Fortune program. In a resume submitted to UBS in 2008, Aleynikov listed the development of the Wheel of Fortune website as one of his accomplishments.

## I. Procedural History

The Indictment, filed on February 11, 2010, charged Aleynikov in three counts with theft of trade secrets in violation of the Economic Espionage Act of 1996 (the "EEA"), 18 U.S.C. §§ 1832(a)(2) and (a)(4); transportation of stolen property in interstate commerce, in violation of 18 U.S.C. § 2314; and unauthorized computer access and exceeding authorized computer access in violation of 18 U.S.C. §§ 1030(a)(2)(C) and 1030(c)(2)(B)(i)-(iii).

On July 16, Aleynikov moved to dismiss each of these counts. In an Opinion of September 3, the Court granted Aleynikov's motion to dismiss the Third Count and denied his motion with respect to Counts One and Two. *United States v. Aleynikov,* 737 F.Supp.2d 173, 194 (S.D.N.Y.2010) (hereinafter the "September 3 Opinion").

Trial on the remaining two counts began on November 29. The parties delivered their summations on December 9, and on December 10, the jury returned a verdict of guilty on both counts. Sentencing is set for March 18, 2011.

On December 23, 2010, Aleynikov moved pursuant to Federal Rules of Criminal Procedure 29 and 33 to set aside the verdict and to dismiss the Indictment, or in the alternative, for a new trial. The motion was fully submitted on January 28, 2011.

## DISCUSSION

 Rule 29 permits a defendant to move for a judgment of acquittal on the basis of insufficiency of the evidence. Fed. R.Crim.P. 29(c). A judgment of acquittal should only be entered if the court concludes that "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Cassese,* 428 F.3d 92, 98 (2d Cir.2005) (citation omitted). Rule 33 authorizes a district court to grant a new trial "if the interest of justice so requires." Fed.R.Crim.P. 33(a). A motion for a new trial may be granted only "sparingly and in the most extraordinary circumstances." *United States v. Triumph Capital Group, Inc.,* 544 F.3d 149, 159 (2d Cir.2008) (citation omitted). The motion should not be granted "unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Id.* (citation omitted).

In his lengthy motion, Aleynikov has questioned the sufficiency of the evidence on three issues; sought reconsideration of three pre-trial rulings; challenged eight evidentiary rulings; raised one discovery issue; accused the Government of prosecutorial misconduct in its summation; complained about the closure of the courtroom; and found error in several of the Court's trial management decisions. Each of these challenges will be addressed in turn. To be evaluated fairly, many of these issues require a description of the context in which they arose.

## I. Sufficiency of the Evidence

Aleynikov principally argues that the evidence presented at trial was insufficient for a rational juror to find that he intended to steal Goldman Sachs' proprietary computer source code. As at trial, he argues that he only intended to take open source code, and that he accidentally took Goldman Sachs' proprietary code because the two types of source code were so intertwined in the Goldman Sachs system. Aleynikov further argues that the evidence at trial was insufficient to establish either that he intended to benefit himself or Teza by taking the computer source code or that he intended to injure Goldman. Finally, Aleynikov argues that the evidence failed to establish the existence of a market for

the stolen computer code, as required for the crime of interstate transportation of stolen property.

■ A defendant who challenges the sufficiency of the evidence to support his conviction bears a "heavy burden." *United States v. Bullock*, 550 F.3d 247, 251 (2d Cir.2008). In deciding such a motion, the court must "view the evidence in the light most favorable to the government and draw all reasonable inferences in its favor." *United States v. Lee*, 549 F.3d 84, 92 (2d Cir.2008) (citation omitted). The evidence is considered "in its totality, not in isolation, and the government need not negate every theory of innocence." *Id.* (citation omitted). Under Rule 29, a district court must affirm the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bullock*, 550 F.3d at 251 (citation omitted).

A. Intent to Steal Goldman Sachs' Proprietary Code

■ To establish a violation of the EEA, the Government was required to prove *inter alia* that Aleynikov acted with intent to convert proprietary source code to the economic benefit of himself or Teza and that he knew or intended that doing so would injure Goldman Sachs. 18 U.S.C. § 1832(a). Aleynikov first contends that the evidence offered at trial does not support the Government's theory that Aleynikov stole Goldman Sachs' proprietary computer source code to use it in building Teza's high frequency trading platform. According to Aleynikov, because there was open source code embedded in the proprietary source code that he uploaded to the German server, the Government cannot prove beyond a reasonable doubt that he intended to steal proprietary code. Relying principally on some of the passages in his written post-arrest statement, Aleynikov argues that he was merely attempting to collect open source code, and as a consequence of this effort he mistakenly collected proprietary code intertwined with open source code. Further, Aleynikov argues that "Teza did not want or need Goldman's code," thereby undercutting the Government's theory that Aleynikov stole the code to use at his new job with Teza.

There was more than sufficient evidence presented at trial, however, for a rational juror to conclude that Aleynikov intended to steal Goldman Sachs' proprietary source code. First, it was undisputed at trial that Aleynikov actually did take proprietary source code from Goldman Sachs. As Aleynikov concedes in his motion papers, the code he took from Goldman Sachs included a "purposefully designed" portion of the Goldman Sachs "proprietary, custom-built trading system." Indeed, the evidence showed that Aleynikov took a significant percentage of the proprietary source code for that system. While Aleynikov attempted to show that there was open source code embedded within the proprietary code and to identify the files in which that might be true, his expert witness was only able to identify one file among those taken by Aleynikov that both bore a Goldman Sachs copyright banner and appeared to contain open source code.

In addition to the scale of Aleynikov's theft of proprietary source code, Aleynikov's intent to take proprietary code was evident from the elaborate measures he took to evade Goldman Sachs' security system. He chose a server in Germany that was not blocked by the firm's firewall and attempted to erase his bash history to hide evidence of the source code uploads to the German server.

Evidence of Aleynikov's motive reinforced the evidence of his intention to take proprietary source code from Goldman Sachs. Aleynikov took source code that

would directly and immediately benefit Teza. After uploading the code to the German server from the Goldman Sachs computer system, Aleynikov downloaded the code to a laptop and a thumb drive and took both items to a meeting at Teza's Chicago office. Even more brazenly, he uploaded to Teza's servers at least two files—"AtomicIntTest" and "DenseMap"—which were components of OBB, and did so after carefully stripping them of all identifying Goldman Sachs markers. And in an email to his Teza colleagues, Aleynikov implied that "AtomicIntTest" and "DenseMap" were the product of his own efforts, rather than files stolen from Goldman Sachs.

As noted, there was ample evidence that Teza could have benefitted immensely from access to Goldman Sachs' proprietary source code. Goldman Sachs is considered a leader in the high frequency trading business and thus would serve as a model for those attempting to enter the industry. Malyshev, Teza's founder, testified that his goal in starting Teza was to "build the best high frequency company in the world." There was evidence that it would take a new entrant in the high frequency trading business 2 years and $10 million to build the infrastructure for a high frequency trading system.

Further adding to the pressure facing a new entrant in the business, Malyshev had imposed the ambitious deadline of December 1, 2009, less than a year after he founded Teza in March 2009, for the firm to begin trading. Thus, there was pressure on the firm and its employees to develop a trading system quickly, as evidenced by Malyshev's exhortation in an email that his employees "move fast." Malyshev agreed to compensate Aleynikov $1.2 million for his services as a computer programmer, which was $800,000 more than Aleynikov's current salary at Goldman Sachs. Aleynikov's salary and the culture Malyshev was creating at Teza put pressure on Aleynikov to succeed and succeed quickly. Aleynikov's future at Teza depended on his ability to help the firm achieve its aggressive development goals.

Given all this, a rational juror could easily have concluded that Malyshev lacked credibility when he asserted that he would not have used Goldman Sachs' trading system even if it was offered to him and that he would have fired Aleynikov on the spot if Aleynikov had stolen code from Goldman Sachs.[1] But, whatever the jury's evaluation of Malyshev's credibility, there was more than sufficient evidence to support a finding that it was Aleynikov's intention to steal proprietary source code.

The jury was also entitled to rely on Aleynikov's prior infringement of the intellectual property of the Wheel of Fortune game show. This incident sheds further light on Aleynikov's intent to infringe on Goldman Sachs' intellectual property by stealing its proprietary source code because it reveals that Aleynikov had trampled on intellectual property rights in the past. Indeed, Aleynikov even mentioned his Wheel of Fortune website on a 2008 resume that he used to apply for a position

---

1. The parties agreed at trial to refrain from examining Malyshev regarding a lawsuit brought by Citadel, his former employer, alleging that Malyshev had violated his non-compete agreement by forming Teza and that Malyshev had stolen trade secrets from Citadel, among other allegations. Whether the parties suggested it or not, however, the jury could have relied on the $1.2 million salary offered by Teza to Aleynikov as additional evidence that the stolen source code was a highly valuable commodity and that competitors of Goldman Sachs were willing buyers. Indeed, Aleynikov's supervisor, Adam Schlesinger ("Schlesinger"), testified that the $1.2 million figure was outside of the range of reasonable compensation for computer programmers at Aleynikov's level.

at UBS, despite the fact that the project ended in the entry of a permanent injunction against him.

The jury was also entitled to reject Aleynikov's post-arrest statement (made after he finally admitted that he had taken proprietary code from Goldman Sachs) that he had taken that proprietary code inadvertently in the course of attempting to retrieve open source code. This argument had little persuasive force in light of the evidence outlined above. But, even more fundamentally, it made little sense. Given that open source code is available online at no cost, if Aleynikov had merely wanted to collect open source code, he could easily have done so online instead of copying Goldman Sachs code and undertaking the difficult and painstaking task of separating any open source code embedded in the proprietary code. Indeed, the only way to identify any open source code that might be embedded in the proprietary code would be to separately obtain open source code and compare it line-by-line to the proprietary code—a labor-intensive and completely unnecessary task if you simply want access to open source code.

Finally, the jury was instructed on Aleynikov's defense that he intended only to take and use open source code. The following instruction was given on Aleynikov's theory of defense:

> The defendant has pleaded not guilty to both crimes. In particular, the defendant denies that he intended to convert Goldman Sachs' computer source code to benefit himself or Teza, and denies knowing or intending that his actions would injure Goldman Sachs. Mr. Aleynikov's defense is that he mistakenly

took more files from Goldman Sachs than he had intended to take; that he had only intended to take open source code on which he had worked while at Goldman Sachs. He contends that he acted with no malicious intent and did not share and did not intend to share any computer source code owned by Goldman Sachs with Teza.

For all of the reasons just described, the jury's rejection of this defense is not surprising.[2]

### B. Intent to Benefit Himself or Teza and Intent or Knowledge of Injury to Goldman Sachs

■ Aleynikov also argues that there was insufficient evidence at trial to establish that he intended to benefit himself or Teza in taking the proprietary code, or that he intended to injure Goldman Sachs. Aleynikov again advances the argument that he merely intended to take open source code and points to his post-arrest statements for support.

As described above, there was ample evidence for the jury to conclude that Teza would have benefitted enormously from access to Goldman Sachs' proprietary code. There was also evidence that Aleynikov would have benefitted personally from access to the code during his employment with Teza.

Aleynikov argues that there is no evidence that he intended to harm Goldman Sachs. He reasons that his theft would only have harmed Goldman Sachs if Teza adopted a trading strategy that was substantially similar to Goldman Sachs' trading strategy. According to Aleynikov, this was particularly unlikely with respect to

---

**2.** This charge on the defense theory, which was requested by Aleynikov, was in tension with some of his post-arrest statements. Specifically, Aleynikov told the FBI following his arrest that he had intentionally collected *both*

open source code and proprietary code, with the idea of separating out the open source code once he had downloaded it to his home computer.

options trading since Malyshev testified that Teza was not currently trading options.

There was abundant evidence that the theft of Goldman Sachs' proprietary source code for its high frequency trading system was done with the intent to injure and knowledge of injury to Goldman Sachs, only one of which mental states the Government was required to establish for this element of the crime. It was undisputed that Teza was preparing to enter the high frequency trading business. Most of the components that Aleynikov stole from Goldman Sachs were critical to the design and operation of any high frequency trading system, whether the system traded stocks, options, or both. In any event, Malyshev had made scores of millions of dollars trading options for Citadel's high frequency trading group before he joined Teza, and the jury was entitled to find that in founding Teza he planned to use that expertise and, after developing the necessary infrastructure and trading systems, resume competing directly with Goldman Sachs as well as with every other major player in the high frequency trading business. It is easy to conclude that if Teza had had access to Goldman Sachs' code, this would have damaged the profitability of Goldman Sachs' business.

Knowledge of and intent to injure Goldman Sachs is also apparent from the extensive evidence at trial of the secretive nature of the high frequency trading business. Malyshev himself required Teza's employees to sign non-compete agreements so that competitors would not have access to Teza's strategies and trade secrets. Members of Goldman Sachs' security information team described in detail the various measures that the firm takes to ensure that its proprietary code remains secure. Other evidence described the steps Aleynikov took to circumvent these measures in his effort to escape detection. Thus, there was sufficient evidence for the jury to find that Aleynikov was fully aware that his theft would harm Goldman Sachs, and that he intended to so harm Goldman Sachs when he stole its proprietary source code and attempted to use it for the benefit of a competitor in the industry.

### C. Evidence of a Market for the Stolen Code

■ Aleynikov contends that the Government failed to present evidence of a market for the stolen source code, and thereby failed to prove that the stolen source code constituted goods, as required by 18 U.S.C. § 2314.[3] According to Aleynikov, the Government may not rely on the existence of a market for an entire high frequency trading system or even for stand-alone components of such a system, but must offer evidence of a market for the particular components of the trading system taken by Aleynikov.

The evidence presented at trial established that Aleynikov took a very substantial portion of the source code for the Goldman Sachs high frequency trading system, including the entirety of several critical components of the system. The evidence also established that the system's source code, as well as specific components taken by Aleynikov, would be highly valuable to a competitor. The Government demonstrated that portions of the Goldman Sachs system were acquired when the firm purchased Hull Trading Company for the substantial sum of $500 million and that there were commercially available, ex-

---

**3.** This argument is virtually the only defense asserted against the conviction under 18 U.S.C. § 2314. Indeed, the defendant's sum-mation at trial focused exclusively on the EEA count of the Indictment.

pensive substitutes for several components of the Goldman Sachs trading system.[4]

Aleynikov's argument that evidence of a market for stand-alone components or for an entire system is not relevant to establishing a market for integrated components of a proprietary system is unavailing. First, it is worth noting that portions of the source code stolen by Aleynikov were capable of operating without the rest of the Goldman Sachs system. Moreover, Aleynikov does not assert that the stolen code was worthless without the rest of the Goldman Sachs system or dispute that there is a well-established commercial market for computer source code for high frequency trading systems. Evidence of that lawful market was highly relevant to show the existence of demand for the battle-tested and highly successful proprietary code developed by Goldman Sachs, code that could only be obtained by a competitor through theft. Thus, there was sufficient evidence for the jury to conclude that there was a market for the stolen computer source code. Indeed, Aleynikov did not argue otherwise in his summation to the jury.

## II. Motions for Reconsideration

Several of Aleynikov's arguments, although presented under the umbrella of a Rule 29 or Rule 33 motion, are more appropriately characterized as motions for reconsideration. Although the federal and local rules of criminal procedure do not specifically provide for motions for reconsideration, courts in this district have applied Local Civil Rule 6.3 in criminal cases.

*United States v. Yannotti*, 457 F.Supp.2d 385, 388–89 (S.D.N.Y.2006); *United States v. Ramerez*, No. 03 Cr. 834(SHS), 2004 WL 1252940, at *1 (S.D.N.Y. June 7, 2004).

■ A motion for reconsideration will generally be denied unless "the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *In re BDC 56 LLC*, 330 F.3d 111, 123 (2d Cir.2003) (citation omitted); *Yannotti*, 457 F.Supp.2d at 389. "Local Rule 6.3 is narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court." *Yannotti*, 457 F.Supp.2d at 389.

### A. Goldman Sachs' Trading System is a Product in Interstate Commerce

■ Aleynikov again advances the argument, first made in his July 16, 2010 motion to dismiss the Indictment, that Goldman Sachs' trading system does not constitute a "product that was produced for or placed in interstate or foreign commerce" for purposes of the EEA. According to Aleynikov, the trading system does not move in interstate commerce because it "is a secret trading system that was developed for Goldman's internal use and for its'[sic] sole benefit."

The September 3 Opinion rejected this argument, reasoning that the trading system is a product "produced for" interstate commerce because "the sole purpose for which Goldman purchased, developed, and

---

**4.** Aleynikov reasserts his objection made at trial to the admission of evidence of a market for an entire high frequency trading system, and specifically, that Goldman Sachs paid $500 million to acquire portions of its high frequency trading system from the Hull Trading Company. But "so long as a chain of inferences leads the trier of fact to conclude

that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry" under Rule 401, Fed.R.Evid. *United States v. Quattrone*, 441 F.3d 153, 188 (2d Cir.2006). Moreover, Aleynikov never identified any ground under Rule 403, Fed.R.Evid., to justify exclusion of this probative evidence.

modified the computer programs that comprise the Trading System was to engage in interstate and foreign commerce." *Aleynikov,* 737 F.Supp.2d at 179. Aleynikov does not point to any "controlling cases or data that the court overlooked" in reaching this conclusion; indeed, he merely incorporates by reference the same arguments and case law presented in his motion to dismiss. Thus, Aleynikov fails to meet the strict standard for motions for reconsideration.

Not surprisingly, the evidence presented at trial supported the conclusion that Goldman Sachs' high frequency trading system was produced for interstate commerce. As described above, Goldman Sachs' trading system allows it to trade on national and international securities and commodities exchanges. Among other functions, the trading system processes data from the various exchanges and uses this information to price options and execute trades. The evidence at trial demonstrated that the high frequency trading system is the driving engine behind a portion of Goldman Sachs' profitable trading activity. Thus, Aleynikov's motion must be denied.

**B. The Stolen Source Code is a "Good, Ware or Merchandise"**

■ Aleynikov moves to dismiss Count Two of the Indictment, which charges transportation of stolen property in interstate or foreign commerce in violation of the National Stolen Property Act, 18 U.S.C. § 2314. As in his motion to dismiss the Indictment, Aleynikov argues that the stolen source code is not a "good, ware or merchandise," as required by the statute; he contends that the statute only covers theft of tangible property, and not intangible items such as computer source code.

Again, Aleynikov offers no new arguments or case law to contradict the conclusion in the September 3 Opinion that the

statute does not distinguish between tangible and intangible property. *Aleynikov,* 737 F.Supp.2d at 181–82. Further, as discussed above, the evidence at trial established the existence of a market for high frequency trading systems, lending support to the conclusion that the stolen source code constitutes a "good" for purposes of the statute.

**C. Aleynikov's Post–Arrest Statements**

■ Aleynikov renews his argument, first made in his October 25, 2010 motion *in limine,* that statements he made to FBI agents following his arrest on July 3, 2009 should have been suppressed. Aleynikov argues that those statements were taken in violation of New York Rule of Professional Conduct 4.2(a), which prohibits lawyers from communicating with parties whom they know to be represented by counsel without prior consent of counsel. At a final pretrial conference held on November 19, the Court denied Aleynikov's motion, finding that the motion was both untimely and without merit; the Court memorialized this ruling in a December 14 Opinion. *United States v. Aleynikov,* No. 10 Cr. 96(DLC), 2010 WL 5158125, at *4 (S.D.N.Y. Dec. 14, 2010).

Aleynikov makes no new legal arguments in support of his motion for reconsideration. Accordingly, it is denied.

**III. Evidentiary Rulings**

**A. Exclusion of Bail Hearing Statements**

■ Aleynikov argues that the Court erred in excluding evidence of certain statements made by Assistant United States Attorney ("AUSA") Joseph Facciponti ("Facciponti") at his bail hearing on July 4, 2009. During that lengthy and contentious bail argument, Facciponti stated twice that Aleynikov had stolen the "entire platform" for the Goldman Sachs

high frequency trading system. The Indictment that was subsequently filed charged only that Aleynikov had misappropriated portions of the trading platform. Aleynikov has not shown that Facciponti's statements during the bail argument were admissible at trial.

At a November 19 pretrial conference, Aleynikov disclosed his plan to use the Government's assertion that the "entire platform" had been stolen as a central part of his defense at trial:

> I certainly intend to open on the fact that the FBI and the government initially made the allegation in this court that the entire platform had been taken. It goes to a number of issues that are relevant to this case. The credibility of these witnesses, not the least important, that is the credibility both of the alleged victim being Goldman Sachs and the FBI agent who made those statements that caused the assistant United States attorney at the bail hearing to say that the entire platform had been taken and that it was the sort of thing that could be used to manipulate the market. Obviously, a very substantial part of our defense in this case goes to the utility of the things that were taken from Goldman Sachs in the waning days of Mr. Aleynikov's employment there. And so I do very much intend to—very important to our defense to be able to let the jury know exactly how much investigation was done in this case before Mr. Aleynikov was arrested, and information went out around the world on the web that had him cast as the fellow who had stolen the goose that laid the golden eggs for Goldman Sachs.

In further support of this argument, in his pre-trial motion of November 22 Aleynikov pressed the theory that Facciponti's statements should be admitted at trial as admissions of a party opponent under Federal Rule of Evidence 801(d)(2). Aleynikov wished to include in his opening statement to the jury the fact that the Government had argued during a bail hearing that Aleynikov took the entire Goldman Sachs high frequency trading platform and then point out that the Government had only charged him in the Indictment with taking portions of the platform. Defense counsel explained that the Government's change in position was relevant evidence of Aleynikov's lack of intent to harm Goldman Sachs. At the final pretrial conference on November 24, the Court denied Aleynikov's application to present Facciponti's statements to the jury.

In denying Aleynikov's motion, the Court described the factual context for Facciponti's statements at the bail hearing, and also pointed out that neither the arrest complaint, which Aleynikov possessed at the time of the bail argument, nor the Indictment accused Aleynikov of taking the entire trading platform. The Court then undertook a review of Second Circuit case law with respect to the application of Rule 801(d)(2) to statements by Government agents. The Court observed that there was no Second Circuit case holding that a statement during a bail hearing is properly admissible against the Government. Indeed, each of the Second Circuit cases dealing with this issue involved the admission of far more formal statements, such as statements in a bill of particulars, or statements made in summation at trial. *See United States v. Yildiz*, 355 F.3d 80, 82 (2d Cir.2004) (sworn statement to a judicial officer); *United States v. Salerno*, 937 F.2d 797, 810 (2d Cir.1991) (Government's opening and summation arguments from previous prosecution); *United States v. GAF Corp.*, 928 F.2d 1253, 1258 (2d Cir.1991) (bill of particulars). The Court then applied the three-

part test outlined in *United States v. McKeon*, 738 F.2d 26, 33 (2d Cir.1984), finding *inter alia* that the statements at the bail hearing were neither testimonial nor equivalent to testimonial statements and that the inference Aleynikov sought to draw from the Government's statements at the bail hearing would not be a fair one.

In assessing whether the inference that the defendant sought to draw from Facciponti's statements was fair, the Court noted that the Government had learned of the crime only hours before the bail hearing was held and that it did not yet have access to the code Aleynikov had uploaded to the German server, and therefore did not know the extent of Aleynikov's theft. Moreover, there was little likelihood that the Magistrate Judge was confused or misled by Facciponti's two references to the theft of the "entire platform" during his lengthy presentation. The arrest complaint, which the Magistrate Judge had before him, charged Aleynikov with stealing only 32 megabytes of computer source code; the Magistrate Judge was told that the trading platform consisted of at least 1,224 megabytes of code. Finally, the Court excluded reference to the bail argument because Facciponti's statement during the bail argument did not make Aleynikov's intent to harm Goldman Sachs either more or less likely, and because of Rule 403 considerations.

Aleynikov presents no new arguments or case law in support of his motion here. And indeed, the trial evidence provides further support for the exclusion of the bail statements, as the Government consistently argued at trial that Aleynikov stole only portions of the high frequency trading platform, the same theory presented in the Indictment.

It is worth noting that many of Aleynikov's accusations about the unfairness of this prosecution invoke Faccipointi's refer-

ence in the bail argument to Aleynikov's theft of the "entire platform" for Goldman Sachs' high frequency trading system. Instead of accepting Facciponti's statement as a careless effort to convey to a skeptical Magistrate Judge that the scale of Aleynikov's theft was unprecedented, audacious, damaging, and not yet fully known—points Facciponti made throughout the bail argument—Aleynikov has persisted in construing the inaccuracy as evidence that the Government was simply parroting misrepresentations fed to it by Goldman Sachs and would never have arrested or indeed prosecuted Aleynikov but for this false accusation. For the reasons already outlined, these two misstatements will not bear that weight. A precise figure for the stolen megabytes—to the extent it had been determined as of that date—and the magnitude of the entire trading platform were given to both Aleynikov and the Magistrate Judge at the bail hearing. Those figures and the history of the steps Aleynikov took to commit his theft of the Goldman Sachs trade secrets that were recounted in the arrest complaint fully supported a finding of probable cause for Aleynikov's arrest and prosecution. There was no need to exaggerate. The undisputed facts establish that Aleynikov stole a massive amount of proprietary source code.

**B. Cross Examination of McSwain**

▇ Aleynikov argues that the Court erred in precluding him from questioning FBI agent McSwain regarding the content of statements made by Goldman Sachs employees to the FBI prior to Aleynikov's arrest. This argument is without merit.

The subject of McSwain's cross examination first arose at a pretrial conference on November 19. Aleynikov alerted the Government that he intended to cross examine McSwain regarding his conver-

sations with Goldman Sachs employees during the course of the Government's investigation. Aleynikov explained that it was his understanding that representatives of Goldman Sachs had told the FBI during its investigation that Aleynikov had stolen Goldman Sachs' "entire" high frequency trading platform, and that McSwain included those representations in the arrest complaint. Aleynikov represented that he intended to cross examine McSwain about those statements when the Government called McSwain as a witness, and also planned to refer to those statements by Goldman Sachs representatives in his opening statement to the jury. Defense counsel further explained that even if this topic went beyond the scope of McSwain's direct examination, this line of inquiry would be properly explored on McSwain's cross examination as impeachment.

By a motion *in limine* of November 23, the Government sought to preclude Aleynikov from examining McSwain about the substance of statements made by Goldman Sachs employees to Government agents. In his response to the Government's motion, Aleynikov argued that since statements of Goldman Sachs representatives made to McSwain during the course of the Government's investigation were "explicitly incorporated" into the arrest complaint, they should be admitted as non-hearsay adoptive admissions under Federal Rule of Evidence 801(d)(2)(B). Aleynikov identified several passages in the arrest complaint that he claimed incorporated the statements of Goldman Sachs employees and about which he intended to cross examine McSwain. These statements generally detailed Aleynikov's uploads of source code to the German server during the last

days of his employment. For example, McSwain averred in the complaint that "[a]ccording to representatives of the Financial Institution, ... on at least four occasions starting on or about June 1, 2009 and ending on or about June 5, 2009, [the defendant's work desktop was used to] transfer a total of approximately 32 megabytes of information through https to a certain website ... outside of the Financial Institution's computer network." Notably, Aleynikov's brief did not identify any passage in the arrest complaint asserting that Aleynikov had taken the "entire" trading platform.[5] Nonetheless, in his brief Aleynikov argued that the Government's change in its view of the scale of Aleynikov's theft, having abandoned in the Indictment any claim that the defendant took the entire platform, bore directly on Aleynikov's intent.

The Court explored this issue at a November 24 pretrial conference. Aleynikov admitted at that time that he was not contending that there was a false statement in the complaint. On the basis of that assertion, the Court observed generally that the substance of the statements by Goldman Sachs employees to McSwain would not appear to be proper impeachment of McSwain but that any determination of what might constitute proper impeachment would be affected by the scope of the Government's direct examination of McSwain.

The Government did call McSwain as a witness at trial. McSwain principally testified about Aleynikov's arrest and subsequent interview at FBI headquarters on the night of July 3, 2009. None of his direct testimony recited any of his conversations with Goldman Sachs witnesses.[6]

---

**5.** The arrest complaint does not assert that Aleynikov took the source code for the entire

Goldman Sachs high frequency trading system.

**6.** The parties appear to agree that it would

Aleynikov did not cross examine McSwain about his conversations with Goldman Sachs employees, or make any application to do so. Nor did Aleynikov call McSwain as a defense witness to impeach any other trial witness.

In his post-trial motion, Aleynikov argues that McSwain's credibility at trial could have been impeached by showing that McSwain lied in the arrest complaint and that he had conducted "no investigation" to verify the truth of the statements from Goldman Sachs employees recited in the arrest complaint. Aleynikov contends that such cross examination was particularly relevant since two Goldman Sachs witnesses, Joseph Yanagisawa ("Yanagisawa") and Paul Walker ("Walker"), "disclaimed any recollection of the statements" attributed to them by McSwain.

This motion is without merit. First, Aleynikov admitted at trial that he could not point to any false statement made by McSwain in the complaint. The instant motion also fails to identify any such false statement, and in his reply brief Aleynikov abandons this assertion. Second, Aleynikov has failed to identify questions that he placed to McSwain about the quality of his investigation that he was denied an opportunity to pursue. Nor has Aleynikov explained how such a line of examination would have been appropriate. As a general matter, the quality and scope of the Government's investigation are not appropriate lines of examination and Aleynikov has not shown how McSwain's direct examination made them so. The issue for a jury is whether the evidence that the Government does manage to offer at trial is sufficient to prove a defendant guilty be-

yond a reasonable doubt. *United States v. Saldarriaga*, 204 F.3d 50, 52–53 (2d Cir. 2000). Third, neither Yanagisawa, a vice president in information technology at Goldman Sachs, nor Walker, a managing director in the fixed income, currency, and commodities group at Goldman Sachs, both of whom testified before McSwain took the stand, "disclaimed" a recollection of their statements to McSwain.

Yanagisawa testified that he was satisfied that the information that he provided to the FBI was accurate. Further, when confronted with the statements made in the arrest complaint, Yanagisawa verified their accuracy. For example, he confirmed that, as stated in the complaint, Goldman Sachs had begun monitoring uploads of large amounts of data from the firm's servers at the end of June 2009. He also confirmed, again as stated in the complaint, that as a result of that review, Goldman Sachs was alerted to Aleynikov's large uploads of approximately 32 megabytes of data in early June. Aleynikov also points to Walker's testimony that he could not recall how many lines of computer source code in Goldman Sachs' high frequency trading platform changed weekly. But the arrest complaint does not contain any assertion as to the number of lines of code comprising the platform that change weekly, so Walker's testimony does not in any way contradict the veracity of the complaint.

Thus, Aleynikov has not shown that he was denied the opportunity to conduct an appropriate cross examination of McSwain. It is noteworthy that Aleynikov did not call McSwain on the defense case in order to

have been inappropriate for McSwain to recount for the jury the substance of his conversations with third party witnesses during his investigation. Indeed, Aleynikov had moved prior to trial to exclude any testimony from McSwain or any other Government agent

about the operation, profitability, and secretive nature of Goldman Sachs' high frequency trading system as revealed to the agents during their conversations with Goldman Sachs employees.

impeach Yanagisawa, Walker, or any other trial witness with statements they had made to McSwain that contradicted their trial testimony.

## C. Cross Examination of Yanagisawa and Schlesinger

In the course of his motion concerning the scope of the cross examination of McSwain, Aleynikov mentions that he was also precluded from attacking the credibility of two witnesses from Goldman Sachs, Yanagisawa and Adam Schlesinger ("Schlesinger"), Aleynikov's direct supervisor. Aleynikov cross examined both witnesses at length and did not point at trial—nor in this motion—to any line of cross examination that he was precluded from pursuing or any question to which an objection was improperly sustained. While several of the Government's objections to questions he posed were sustained, where Aleynikov sought to determine the basis for those rulings, they were explained to him and he has not taken issue with those explanations.

In the case of Yanagisawa, Aleynikov did not raise any issue about evidentiary rulings at the break that followed Yanagisawa's testimony and indeed, at that time, withdrew an application he had made earlier concerning Yanagisawa and assented to him being excused. At the end of the trial day, however, Aleynikov did inquire about the grounds on which some of the objections had been sustained. The Court addressed each of the issues raised at that time and gave Aleynikov an opportunity to review the transcript overnight and ask for additional guidance in the morning if he thought it would be helpful. The following morning, Aleynikov indicated that he had no issues to raise. Aleynikov never sought any explanation for the evidentiary rulings made during Schlesinger's testimony.

## D. Refusal to Strike Government Exhibit 108

■ Aleynikov argues that the Court erred in its refusal to strike from the trial evidence the eleven Government Exhibits numbered 108–A, B, and D through L. These exhibits include a series of diagrams of the hardware and operating systems employed by Goldman Sachs in its high frequency trading system; Aleynikov uploaded the schematics from the Goldman Sachs system over the same period of time in which he uploaded the proprietary computer source code. Aleynikov argues that since the exhibits were not mentioned in the Indictment, their admission constituted a violation of the Grand Jury Clause of the Fifth Amendment, and that they should have been excluded under Rule 403, Fed. R.Evid., because of the risk that the jury might convict Aleynikov of the uncharged crime of stealing the 108 Exhibits.

Government Exhibits 108 were received without objection at trial on December 1. At the time of their admission, Aleynikov conducted a voir dire of the Goldman Sachs witness who identified the documents. Although the documents were discussed again on December 2, Aleynikov did not make an application to strike the exhibits at that time.

On December 6, Aleynikov made a written and oral application to strike the 108 Exhibits. He explained that the testimony given about the exhibits on December 2 by the Government's expert, in which the expert opined that the information in the documents was not generally known within the industry and would be useful to a competitor, prompted the motion. Aleynikov added that he had come to understand that the Government would argue that the exhibits contained additional Goldman Sachs trade secrets that he had stolen. The Court denied Aleynikov's motion to exclude the 108 Exhibits on December 6.

As the Court explained, the fact that Aleynikov took additional proprietary material belonging to Goldman Sachs at the same time at which he uploaded the computer source code, and specifically material that was integral to the efficient use of the stolen source code, was relevant evidence of Aleynikov's intent to steal proprietary source code.

■ Aleynikov's constructive amendment claim is unavailing. "[C]onstructive amendment occurs when the presentation of evidence and jury instructions modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury." *United States v. Clemente,* 22 F.3d 477, 482 (2d Cir.1994). That did not happen here. The jury was specifically instructed that Aleynikov was charged with theft of computer source code. The phrase "computer source code" was used repeatedly in the jury charge in connection with the description of the elements of both Counts One and Two. Aleynikov does not contend that the charge created any ambiguity on this score and he did not seek to include any special charge regarding the 108 Exhibits in the final charge to the jury.

■ As significantly, evidence that Aleynikov stole additional proprietary material relevant to the design of a high frequency trading system at the same time that he stole the computer source code for such a system "was not constrained by Rule 404(b) because it was necessary to complete the story of the crime on trial." *United States v. Greer,* 631 F.3d 608, 614 (2d Cir.2011). The evidence shed further light on Aleynikov's intended use for the stolen source code, providing further corroboration that he took the code for the purpose of building Teza's high frequency trading platform. Nor has Aleynikov iden-

tified any danger of unfair prejudice to the defendant under Rule 403, Fed.R.Evid. "Evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *Quattrone,* 441 F.3d at 186 (citation omitted). For these reasons, Aleynikov's motion to strike was properly denied.

### E. Wheel of Fortune Rule 404(b) Evidence

■ Aleynikov challenges, as he did at trial, the admission of evidence relating to his operation of a website which imitated the Wheel of Fortune game. The Government gave notice of its intent to introduce such evidence in its motion *in limine* of October 25. The Government sought to admit the complaint in a trademark infringement action filed in the Central District of California against Aleynikov and others; Aleynikov's stipulation for an entry of a permanent injunction; the 1997 permanent injunction against Aleynikov; and the resume that Aleynikov submitted to UBS in May of 2008. The resume listed the operation of the Wheel of Fortune website as one of Aleynikov's accomplishments. Aleynikov argued in his November 6 opposition to the Government's motion that the 1997 conduct was not sufficiently similar to the offenses for which he had been indicted to be relevant, and that the admission of the evidence would invite the jury to infer that Aleynikov had a propensity to infringe on intellectual property rights. The Court ruled on December 7 that the evidence was admissible under Rules 403 and 404(b), Fed.R.Evid.

■ Although evidence of other crimes "is not admissible to prove the character of a person in order to show action in conformity therewith," it can be used "for other purposes, such as proof of motive, opportunity, intent, preparation, plan,

knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). "The Second Circuit's 'inclusionary rule' allows the admission of such evidence 'for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence.'" *United States v. Greer*, 631 F.3d 608, 614 (2d Cir.2011) (citation omitted). In determining admissibility under Rule 404(b), Fed. R.Evid., the court should consider "whether (1) it was offered for a proper purpose; (2) it was relevant to a material issue in dispute; (3) its probative value ... substantially outweighed ... its prejudicial effect; and (4) the trial court gave an appropriate limiting instruction to the jury if so requested by the defendant." *United States v. Guang*, 511 F.3d 110, 121 (2d Cir.2007) (citation omitted).

The Wheel of Fortune evidence was probative of Aleynikov's intent to infringe on Goldman Sachs' intellectual property rights, a hotly contested issue at trial, and was properly admitted under Rule 404(b), Fed.R.Evid. The fact that Aleynikov had touted as recently as 2008 that one of his accomplishments was his operation of a website that infringed on the Wheel of Fortune trademark was highly relevant to establishing his intent in taking proprietary source code from Goldman Sachs. The jury was entitled to infer that since Aleynikov showed no qualms about violating intellectual property rights using his computer skills in the past, and indeed viewed it as one of his marketable skills, that this made it more likely that he intended to steal the proprietary source code from Goldman Sachs.

Nor was the probative value of this evidence substantially outweighed by any of the considerations under Rule 403, Fed. R.Evid. The defendant did not identify any

unfair prejudice that could attach to the admission of the Wheel of Fortune evidence other than the risk that it might be used by the jury as criminal propensity evidence. To insure that the evidence was only used by the jury for a proper purpose, the Court gave the jury a limiting instruction at the time the Wheel of Fortune evidence was admitted and Aleynikov made no objection to this instruction. Moreover, the final jury charge also included a special instruction devoted to the proper use of this evidence to which Aleynikov also made no objection.

## F. Government's Expert Witnesses

On November 24, Aleynikov moved to exclude the entirety of the testimony of Benjamin Van Vliet ("Van Vliet"), one of the Government's expert witnesses, and a portion of the testimony of the Government's other expert witness, Spencer Lynch ("Lynch"), on the grounds that Van Vliet offered unsubstantiated generalizations and assertions not based on his experience with high frequency trading and that Lynch was not qualified to opine on the function of the stolen source code because he was a forensic examiner and not a computer programmer in the high frequency trading business. The Court denied Aleynikov's motion at a final pretrial conference on November 24, and when he renewed it as to Van Vliet in the midst of his cross examination of that expert witness. Aleynikov reasserts the motion here as to both expert witnesses.

Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is

based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed.R.Evid. 702. "While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, the district court is the ultimate gatekeeper." *United States v. Williams,* 506 F.3d 151, 160 (2d Cir.2007) (citation omitted). "The Federal Rules of Evidence assign to [the district court] 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). "[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,* 571 F.3d 206, 213–14 (2d Cir.2009) (citation omitted).

Aleynikov's arguments are unavailing. Van Vliet's testimony only provided further support for a finding that he was qualified to testify as an expert in this case. Van Vliet is a full-time professor at the Illinois Institute of Technology in Chicago, specializing in the mechanics of high frequency trading systems. In addition to teaching courses on subjects such as "algorithmic trading system design and development," Van Vliet published three books about automated trading systems and five or six research articles, and has consulted with institutions engaged in high frequency trading to assist them in improving their systems. Van Vliet provided necessary background on the operation of high frequency trading systems, explaining the procedure by which these systems process market data and translate that data into orders on the securities and commodities exchanges and the various stages of development in designing a high frequency trading system. Van Vliet's overview of the industry also identified the sources of competitive advantage in the industry, including a superior trading strategy, more sophisticated mathematical algorithms for executing that strategy, and a faster speed of execution of trades. Van Vliet provided crucial testimony on the obstacles facing new entrants into the high frequency trading business. When asked about the secretive nature of the business, he explained, "[n]obody talks about what hardware they are using, nobody talks about what software they are using, nobody talks about what off-the-shelf components they are using, because anything would be perceived to be giving away a secret that could infringe on your ability to make money."

When Aleynikov moved during the middle of his cross examination to strike Van Vliet's testimony, Van Vliet had just explained that the teams with which he had worked had not yet succeeded in designing a high frequency trading system that was profitable. Van Vliet's lack of a track record in designing successful trading systems did not disqualify him from serving as an expert on the issues that were the subject of his direct testimony, and Aleynikov does not suggest in his post-trial motion that it does. If anything, this testimony simply reinforced how difficult and expensive it is to build a successful high speed trading platform and system. In any event, while the jury was entitled to use this line of cross examination in its evaluation of the weight to accord the expert's testimony, *see Olin Corp. v. Certain Underwriters at Lloyd's London,* 468 F.3d 120, 134 (2d Cir.2006), it did not make the testimony inadmissible.

Although Aleynikov rests almost entirely on his written pre-trial motion to exclude, Aleynikov does identify three portions of Van Vliet's trial testimony, which he asserts establish that Van Vliet was unqualified to serve as an expert witness. Aleynikov points to Van Vliet's testimony that he had only reviewed approximately 2% of some 2,500 files of stolen source code provided to him by the Government; that Van Vliet was unable to read Erlang, one of the programming languages that was included in the stolen files; and that Van Vliet had assumed for the purposes of his testimony that Goldman Sachs' code actually worked.

The particular passages in Van Vliet's trial testimony that Aleynikov now singles out do not affect the judgment that Van Vliet was well qualified to serve as an expert on the issues on which the Government sought his opinion. Moreover, Aleynikov did not move to strike Van Vliet's testimony on these three grounds at trial. Van Vliet testified that he did not review individually each of the more than 2,500 files of code stolen by Aleynikov; rather, he selected 50 files to review. Van Vliet explained that he employed a sampling procedure to review the code, whereby he reviewed the names of the files to determine what type of code might be contained in each one, and then selected a random sample of both files and lines of code within those files to review. Given the enormous amount of time it would take to review each file and line of stolen code, the procedure employed by Van Vliet was an entirely reasonable one.

Van Vliet acknowledged at trial that he was not an expert in the Erlang or UNIX computer languages, but stated that the stolen source code was written in the computer language C++, which is one of the programming languages he uses to teach courses in high frequency trading. Based on his knowledge of C++, Van Vliet was able to determine generally the function of the code that he reviewed, and this general testimony was all that was required to establish that Aleynikov stole valuable portions of Goldman Sachs' high-frequency trading system.

Finally, Aleynikov attacks Van Vliet's qualifications based on his statement at trial that he assumed that the code he reviewed worked. This too was a reasonable approach given that Van Vliet was aware that the code had been stolen from Goldman Sachs, one of the leaders in the high frequency trading industry.

Aleynikov also renews his motion with respect to Lynch's testimony. Lynch, a private forensic examiner, was retained by the Government to examine the contents of the source code found on Aleynikov's laptop, desktop, and thumb drive. After conducting an examination of these devices, Lynch was able to testify as to the timeline of the various uploads and downloads of source code that Aleynikov undertook. Lynch also compared the source code uploaded from Goldman Sachs' servers to the source code found on Aleynikov's personal devices and testified that the code was identical. In addition, Lynch detailed various modifications made to the source code after it was downloaded to Aleynikov's computer.

Aleynikov asserts that Lynch should have been precluded from testifying regarding the function and meaning of the source code Aleynikov stole; the substance and meaning of any files created or modified by Aleynikov; and the nature and extent of any modifications to any of the stolen source code.[7] Lynch did not testify,

---

**7.** Aleynikov's motion is also directed to "any other subject" that exceeded the scope of

Lynch's expertise as a digital forensic examiner. Without an identification of the inadmis-

however, as to the function, meaning, or substance of the files taken by Aleynikov. Rather, he only identified various files by their directory names without testifying as to their function. He also compared the files that were uploaded to the German server with the files found on Aleynikov's personal computer to determine whether modifications had been made. Lynch was well qualified to identify any such modifications. Indeed, Aleynikov did not renew his objections to Lynch's testimony at trial. Further, in his reply memorandum, Aleynikov abandons any argument that Lynch's testimony was inadmissible. Accordingly, Aleynikov's motion is denied.

G. Statements of David Viniar

 Aleynikov argues that he should have been permitted to call Goldman Sachs' Chief Financial Officer David Viniar ("Viniar") as a witness to elicit public statements that Viniar made during a quarterly earnings call shortly after Aleynikov's arrest. During the call, Viniar stated that "We [Goldman Sachs] still have all the code. It's not like the code had been lost to Goldman Sachs.' And even if it had been, it's a small piece of our business." Viniar also stated that any losses sustained by Goldman Sachs from Aleynikov's theft of source code would be "very, very immaterial." The Court granted the Government's motion to preclude the defendant from mentioning this statement in its opening address to the jury and from calling Viniar as a defense witness. Aleynikov contends that he is entitled to a new trial because he was not permitted to call Viniar as a witness.

The issue of Viniar's statements during the earnings call arose at several points during the trial. Aleynikov first alerted

the Court during the voir dire on November 29 that he intended to reference Viniar's statements in his opening statement. On November 30, the Government moved in writing to preclude Aleynikov from doing so. Prior to the start of trial on November 30, Aleynikov represented that he did not intend to open on the "materiality" comment or the comment that the code was a "small piece" of Goldman Sachs' business. Instead, he wanted to state that Goldman Sachs had publicly taken the position that "it was not harmed." The Court granted the motion to preclude Aleynikov from opening on the Viniar statements, reasoning that it was unlikely that those statements would be admissible at trial. The Court advised Aleynikov that it was not restricting his ability, however, to describe evidence that he expected would show that he had no intention of harming Goldman Sachs and that it was not harmed.

On December 6, the Government advised the Court that Aleynikov had subpoenaed Viniar and asked for a ruling as to whether Viniar's statements would be admissible at trial. The Court observed that Aleynikov could call Viniar to testify, assuming that Viniar had competent evidence to offer the jury relevant to the two crimes with which Aleynikov was charged, and the admissibility of Viniar's statement during the earnings call would depend on the scope of his direct and cross examination. The Government represented that Viniar had no personal knowledge of the events at issue at the trial. Aleynikov then explained that his sole purpose in calling Viniar was to question him about the statements he made during the earnings call, even if he lacked personal knowledge of the events at issue in the trial.

sible expert opinion testimony, however, it is unnecessary to discuss Lynch's testimony fur-

ther.

During this colloquy, Aleynikov explained that he wished to elicit Viniar's statements that we "still have all of the code," the code had not been "lost to Goldman Sachs," and that "even if it had been, it is a small piece of our business." In addition to arguing that the Viniar statements were relevant to the jury's evaluation of whether Aleynikov intended to harm Goldman Sachs, Aleynikov also alluded to a second basis for admission of the statement—whether Aleynikov's theft actually interfered with Goldman Sachs' ownership rights in the code.

The Court ruled the statements inadmissible on December 7 pursuant to Rule 403, Fed.R.Evid., finding that any probative value of the statements on either of the issues identified by Aleynikov was minimal and substantially outweighed by the need to explain the context of Viniar's statements to the jury. Indeed, Aleynikov's concession that he would not seek to elicit Viniar's comment on materiality was a recognition that the context of Viniar's statements was critically important to any understanding of the import of his remarks.

Aleynikov argues here, as he did at trial, that the statement by a Goldman Sachs officer that the firm was not harmed was relevant to proving Aleynikov's lack of intent to harm Goldman Sachs and to proving that Aleynikov had not interfered with Goldman Sachs' ownership of the code. On this second point, Aleynikov further explains in his motion that both counts of the Indictment contain a conversion element, and the fact that Goldman Sachs continued to possess the code for its trading system is relevant to whether Aleynikov's taking of the code actually interfered with the company's right to control and use the code.

For the reasons stated on the record on December 7, any probative value of these statements, which was negligible, particularly in light of the defense proffered at trial, was substantially outweighed by the concerns enumerated in Rule 403, Fed. R.Evid. By the time the Government raised the issue of Viniar's statements on December 6, several Goldman Sachs employees who had direct responsibility for the creation and management of Goldman Sachs' high frequency trading system, including Aleynikov's supervisor, Schlesinger, had testified. Aleynikov had had ample opportunity to examine each of these witnesses about the harm inflicted on Goldman Sachs by the theft of its source code, including the extent to which that theft interfered with the firm's right to control its proprietary code and maintain exclusive access to it.

Rather than cross-examining Goldman Sachs witnesses about the harm inflicted by the theft, however, Aleynikov's defense was essentially that he had no intent to share the firm's trade secrets with Teza and had simply taken the proprietary code to extract open source code from it. While he admitted that he had breached Goldman Sachs' confidentiality agreement, he denied any intent to harm Goldman Sachs by actually using the proprietary code he had taken from it.

Moreover, Aleynikov did not seek to question Viniar directly about the harm that Aleynikov's actions inflicted or could have inflicted on Goldman Sachs. As he explained, Aleynikov simply wanted to question Viniar about the earnings call statements. But, Viniar's statements in an earnings call roughly two weeks after Aleynikov's arrest shed little if any light on Aleynikov's intent in taking the Goldman Sachs proprietary code over the course of the months that preceded his arrest. In addition, earnings calls are opportunities for corporate officers of a public company to discuss the company's financial outlook and whether it will meet the market's ex-

pectations for its earnings. Thus, any discussion of materiality is undertaken in the context of the company's stock price and information that could reasonably be expected to affect a decision to buy or sell the firm's securities. The Government never contended that Goldman Sachs' high frequency trading was anything other than a component of the firm's business. Konstantin Shakhovich, a managing director in Goldman Sachs' quantitative volatility group, testified that the combined revenue of the three divisions of Goldman Sachs' high frequency trading group that he oversaw was approximately $300 million in 2009. In any event, by the time of the earnings call, Aleynikov had already been arrested, German law enforcement had seized Aleynikov's files on German servers, and the risk that Teza would actually be able to use any of the stolen code had been substantially, if not completely, eliminated. Providing all of this context would have involved educating the jury about earnings calls, the overall financial health of Goldman Sachs, and the terminology used in earnings calls, among other things. The risks of confusion and waste of time associated with the fair presentation of this evidence far outweighed the minimal probative value of Viniar's statements. *See Gerber v. Computer Assocs. Int'l, Inc.,* 303 F.3d 126, 136–37 (2d Cir.2002).

As for Aleynikov's argument regarding conversion, the jury was instructed without objection from Aleynikov that "[t]o convert means to take possession of another's property, including by uploading, downloading, copying or transmitting the property, in a way that interferes with the owner's right to control or use its property." *See Morissette v. United States,* 342 U.S. 246, 271–72, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Thus, a person may convert another's property by surreptitiously copying a trade secret and depriving its right-

ful owner of its exclusive use. Nothing in Viniar's statement—made weeks after the defendant's arrest and the seizure of his computers and flash drive—suggests otherwise.

## H. References to Civil Remedies

Aleynikov argues that he is entitled to a new trial because he was prevented from informing the jury at two points during the trial that Goldman Sachs had not pursued civil remedies for his theft of its trade secrets. Specifically, he contends that he was prevented during his opening statement from informing the jury of Goldman Sachs' decision not to pursue a civil suit against Aleynikov. Aleynikov further contends that he was prevented from asking William Whalen ("Whalen"), a vice president in the human capital management division at Goldman Sachs, whether Goldman Sachs had taken any action against Aleynikov.

At several points during his opening statement, Aleynikov argued that his theft of computer source code was properly the subject of a civil suit by Goldman Sachs and not a criminal prosecution by the United States Attorney's Office. Aleynikov began his opening statement by noting that he would "dispute to my death the allegation that violating a Goldman Sachs confidentiality policy is a federal crime." He added that the type of evidence on which the Government was relying in its prosecution was "the stuff of civil trials" and "a breach of confidentiality allegation." He went on to note that "whether you conclude that this is a piece of code that belongs to Goldman or a piece of code that belongs to the public, downloading that code is just not criminal. It's not criminal. A criminal case, on trial for your life. No." The Court instructed the jury to "dis-

regard the last comment."[8]

Shortly thereafter, Aleynikov made another reference to civil remedies:

I will prove to you that if Goldman Sachs believed it, if Goldman believed that Sergey Aleynikov had breached its confidentiality provisions, if it believed that Sergey Aleynikov took its property, it could have sued him in a civil lawsuit. If it believed his downloads violated Goldman Sachs' rights, they could have come to federal court immediately, the day of the downloads—

The Government objected to this comment, and the Court instructed the jury to "disregard" it. Immediately thereafter, Aleynikov remarked that the "evidence will show that Goldman Sachs called the FBI, did not file a complaint, called the FBI, and the evidence will show that ten days later—." In response to this statement, the Court ordered Aleynikov to "respect the [earlier] ruling." But Aleynikov went on to add that "this might be a really interesting civil case. Investment bank and employees slugging it out over who owns lines of code." And he concluded his opening remarks by stating, "When this trial is over, I'll be back to ask you to say no to this wrongful prosecution for a confidentiality breach and set this man free. Thank you."

At the conclusion of Aleynikov's opening statement, the Court instructed the jury,

So, ladies and gentlemen, you've heard some reference to civil litigation and civil lawsuits. Well, as counsel told you, this is a criminal case and, as you know. So, the defendant is charged with two separate crimes; both of them violations of federal criminal law. The burden will be on the government, as I told you, at

this trial to prove the defendant guilty beyond a reasonable doubt. I'll instruct you at the end of the case with respect to the elements of each of those crimes.

On the morning of December 1, the Government introduced several of Goldman Sachs' confidentiality and nondisclosure policies through Whalen. One of the policies provided in relevant part that "Goldman Sachs may seek and obtain injunctive relief against the breach or threatened breach of this agreement in addition to any other legal remedies that may be available." On cross examination, Aleynikov inquired of Whalen as to the definition of "injunctive relief" and Whalen answered that it meant "to stop something that's happening." Aleynikov inquired of Whalen whether he "kn[e]w in this case if Goldman Sachs has pursued injunctive relief against Mr. Aleynikov?" The Government's objection to this question was sustained. Aleynikov then asked if Whalen knew "if Goldman Sachs has taken any action against Mr. Aleynikov for violation of this policy?" Again, the Court sustained the Government's objection.

During a mid-morning break on December 1, Aleynikov inquired as to why he was prevented from asking Whalen whether Goldman Sachs had pursued injunctive relief against the defendant. The Court invited the parties to develop an instruction for inclusion in the jury charge on the issue of Goldman Sachs' right to pursue civil litigation. It then explained that "[i]t is irrelevant to this jury whether or not Goldman Sachs has pursued a civil litigation,"[9] and because the jury would be asked to draw "an improper inference, . . . it's not properly explored."

---

8. The statement that Aleynikov was "on trial for his life" was both improper and false.

9. The Court added, "as we all know, if a civil suit had been filed . . . there would have been a stay application because of the criminal proceedings."

Defense counsel then suggested that the line of inquiry was relevant to Aleynikov's intent when he stole the source code.[10] The Court rejected that argument, ruling that whether or not Goldman Sachs sued Aleynikov after the defendant took the source code had no bearing on the defendant's intent at the time he took the code.[11] The Court noted that the substance of Goldman Sachs' confidentiality policies, including the remedies available to the firm, had been explored in detail with the jury, as well as the fact that Goldman Sachs swiftly brought the theft to the Government's attention after learning of it.

On December 6, the Government submitted a proposed request to charge regarding the opportunity Goldman Sachs had to file civil litigation. Aleynikov did not object to the Government's proposed charge.

At the conclusion of the trial, the Court instructed the jury as follows:

> You have heard reference to Goldman Sachs' right to file a civil lawsuit against Sergey Aleynikov. The circumstances under which a person or entity might or might not bring a civil lawsuit are of no concern here. The two counts of the Indictment charge separate violations of two federal criminal statutes. The issue before you is whether the Government has proven the defendant guilty of the two crimes with which he is charged in the Indictment.

Aleynikov did not object to this instruction either during the charging conference or after the charge was read to the jury.

Whether Goldman Sachs chose to pursue or not to pursue civil remedies against Aleynikov was irrelevant to any of the issues before the jury in this criminal trial, and Aleynikov has not shown otherwise. Instead, in his reply brief on this motion, Aleynikov explains simply that "[t]he jury is entitled to know that a finding of guilt is not the only way to afford relief in a given case." This is a frank admission that it was Aleynikov's trial strategy to invite jury nullification. Aleynikov sought to shift the jury's focus onto the investment firm and the Government, and their actions in obtaining a grand jury Indictment of Aleynikov, and away from the question of whether there was proof beyond a reasonable doubt that Aleynikov had violated criminal laws. As Aleynikov bluntly explained to the Court during the trial, "It is my practice to not take bad, aggressive and ugly prosecutions like this one lying down. To me this is a civil case and the government is carrying Goldman Sachs' water. I think it's despicable."

Aleynikov elaborated on this theme during his summation to the jury. He stated, "[t]his is Sergey Aleynikov, the human being, the person. He is not some file that we opened one day that we decided we were going to turn into a big case. He is a human person, and he didn't commit any crimes." He added, "I'm telling you what's really going on. This is bogus, bogus, bogus, bogus from day one to today. And they know it and they should be ashamed."

In sum, Aleynikov attempted to explore whether Goldman Sachs had actually begun civil proceedings against him in order to invite the jury to disregard the letter of the federal statute criminalizing theft of

---

**10.** Aleynikov no longer suggests in his post-trial motion that this line of inquiry was relevant to his intent.

**11.** The Court observed, "the fact that Goldman Sachs did or did not, after the fact, file a civil lawsuit, particularly when a criminal indictment is being pursued, is irrelevant with respect to the defendant's intent at the time" he took the code.

trade secrets. The Court acted within its authority to avert this appeal to jury nullification. The Second Circuit has stated that it "categorically reject[s] the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent." *United States v. Thomas,* 116 F.3d 606, 614 (2d Cir.1997).

## IV. Discovery of the Entire Goldman Sachs Trading System

Aleynikov complains that he was denied access to the entire Goldman Sachs trading system, which he sought prior to trial through the service of a Rule 17(c) subpoena on Goldman Sachs. Aleynikov contends in his post-trial motion that he needed to examine the entire trading system in order to cross examine trial witnesses effectively about the sufficiency of the security measures Goldman Sachs took to protect against employee theft of source code and about the manner in which the stolen code was integrated into the entire Goldman Sachs trading system.

At a conference on June 29, 2010, held to address Aleynikov's Rule 17(c) subpoena, Aleynikov asserted that he would not be able to prove that the components he downloaded did not have "independent inherent intrinsic economic value" without access to the entire Goldman Sachs trading platform. Aleynikov explained that he intended to prove at trial that the source code he stole did not have independent economic value, and that therefore he could not have harmed Goldman Sachs or benefitted himself by taking the code. The Court denied Aleynikov's request for access to the entire trading system, finding that Aleynikov had failed to make a particularized showing that he would be unable to elucidate the workings of the stolen components for the jury without access to

the entire system. But the Court left open the possibility that Aleynikov might obtain more general information about the workings of the trading system from the Government. The Court explained that it saw no reason why the parties could not proceed on a more general level when describing the components of a high frequency trading system to the jury. The Court noted that the decision about access to additional Goldman Sachs proprietary information had to be made with care and a precise understanding of what Aleynikov needed for his defense.

In his subsequent motion *in limine* of October 25, Aleynikov requested that the Court preclude the Government from "introducing details of the Trading System or the Security System within the scope of the subpoena Aleynikov served upon Goldman." Aleynikov argued that the introduction of such evidence would violate his Sixth Amendment right of confrontation and the Best Evidence Rule, Fed.R.Evid. 1002. The Court denied Aleynikov's motion at a November 19 conference, reasoning that Aleynikov had made no showing that Aleynikov had attempted to request information of a more general nature about the trading system and that that more general information proved to be inadequate.

In his post-trial motion, Aleynikov identifies essentially two ways in which he was handicapped at trial because of his lack of access to the entire trading system. He asserts that he was unable to confront Government expert Van Vliet's suggestion that Aleynikov had taken everything one needed to begin high frequency trading, and was unable to prepare his own expert, Dr. Benjamin Goldberg ("Goldberg"), for cross-examination about how the file DenseMap worked within the context of Goldman Sachs' larger system. Aleynikov explains that the Court "would not permit"

the jury to learn that Goldberg's inability to answer the Government's questions on cross examination was due to a lack of access to Goldman Sachs' source code for its entire system, rather than the expert's lack of skill. In his reply memorandum, Aleynikov adds that without the entire trading system, he could not cross-examine Navin Kumar ("Kumar"), a former computer programmer in Goldman Sachs' quantitative trading group, about the functionality and value of DenseMap.

Because the expert testimony at trial focused almost exclusively on the components of Goldman Sachs' trading system stolen by Aleynikov and because there was no difficulty in confining the experts' testimony to these components, Aleynikov's arguments are groundless. Van Vliet discussed components of the source code stolen by Aleynikov such as OBB and the theoretical value library that were also discussed by Goldman Sachs witnesses. Drawing on his experience in studying and designing high frequency trading systems, Van Vliet was able to identify for the jury generally the function that each of those components would have performed within a larger trading system. Contrary to Aleynikov's assertions, Van Vliet did not testify that Aleynikov stole everything necessary to begin high frequency trading. Rather, Van Vliet testified that the components stolen by Aleynikov would be highly valuable to a competitor as stand-alone items.

As for Aleynikov's alleged inability to adequately prepare Goldberg regarding DenseMap, neither Van Vliet nor Goldberg had access to the source code comprising Goldman Sachs' entire trading system. Both experts were given only the source code stolen by Aleynikov and thus were operating on a level playing field. In any event, Goldberg's testimony regarding DenseMap did not require access to any other portion of the trading system code.

DenseMap was created by Kumar, who described its creation and purpose during his trial testimony. DenseMap is one of scores of files within OBB, an application that processes price information from various securities exchanges. The code that Kumar wrote for OBB permitted the processing to occur extremely quickly. As Kumar explained to the jury, even though he did not use any open source code to write DenseMap, he did not include a Goldman Sachs copyright banner on that code because no one had instructed him to do so. Kumar added, however, that one of his innovations in writing DenseMap was to use a textbook algorithm to solve the problem he addressed with the creation of DenseMap. The one file within OBB for which Kumar used open source code was a file named Atomic. Kumar also testified that OBB had no "dependencies," that is, it did not require another piece of software to function.

Aleynikov's argument, raised for the first time in his post-trial reply brief, that he was unable to properly cross examine Kumar regarding the function of OBB and DenseMap in the trading system without access to the entire trading platform, is unavailing. Aleynikov questioned Kumar at length regarding the amount of open source code contained in the DenseMap application. Indeed, during a closed session, Aleynikov inquired of Kumar as to the various functions performed by DenseMap and the precise open source material that might be contained within the DenseMap source code. Nothing in this examination suggests that Aleynikov needed access to any other part of the Goldman Sachs trading system to examine Kumar effectively, and his reply brief does not provide such an explanation. As significantly, Aleynikov did not argue at the time

of Kumar's testimony, or at any time during the trial, that his examination of Kumar had been hindered because he lacked such access. Thus, Aleynikov has not shown that he needed access to the entire trading platform in order to examine Kumar properly.

Much of Goldberg's testimony regarding DenseMap also took place in a sealed courtroom. In his direct examination, Goldberg explained *inter alia* that he had examined DenseMap and found that it had no banner indicating that it contained proprietary code and that it was contained within the OBB directory, which contained other code derived from open source code. Goldberg added that DenseMap contained "some very simple operations," that it did not seem to relate particularly to high frequency trading, and that its algorithms were like those that can be found in open source code. In his cross-examination, Goldberg admitted that he had not formed the opinion that DenseMap was "definitely" open source code, but that it was a close call. He also admitted that, as a general matter, the fact that a program interacts with open source code does not make the program itself open source code. Goldberg explained that he knew what the code within DenseMap did, but that he did not know how the information it generated was used within Goldman Sachs' high frequency trading system. He further agreed that even if the code within DenseMap was not novel, the way the information it generated was used within a system could be novel. On redirect examination, Goldberg told the jury that he had never been given access to Goldman Sachs' entire platform, and he could not say whether Goldman Sachs used it in a unique way. To answer that question he explained that he would need to look at the code that "calls the procedures to find in that file" and see how the information produced by the code is used and propagated through the system. He concluded with the observation that reasonable minds could differ over whether DenseMap contained open source code.

With the jury excused from the courtroom, the Court inquired *sua sponte* whether the expert actually did need access to the entire Goldman Sachs platform to understand the role that DenseMap played within the trading system. The Government explained that DenseMap was part of the OBB suite of programs, that the OBB files were all turned over in discovery, that two witnesses had testified about the files at trial, and that if Goldberg wanted to see how DenseMap interacted with the surrounding portions of the trading platform he could examine OBB. Aleynikov did not object to those representations and made no application at that time, at the end of the trial day, or at any other time during the trial about Goldberg's lack of access to the entire trading platform.

As stated by the Court at the conclusion of the trial,

There was no particularized showing of need for [the entire trading platform] at the time [of the June 29 conference], and there has been no particularized showing of need for that at any time since June 29, not in any pretrial proceedings, not during this trial. The defense has never questioned that the source code and the other documents that the defendant took from Goldman Sachs were components of its high-frequency trading platform. That's not been in dispute and it couldn't reasonably be in dispute. The defense, as we have heard, was that the components that were taken had embedded in them, at least some of them, some open source code. So whether the rest of the trading platform did or didn't is entirely irrelevant.

Accordingly, Aleynikov's motion is meritless and is denied.

## V. Government Summation

■ Aleynikov contends that the Government's statement during its rebuttal summation that Aleynikov lied in his salary negotiations with Teza constituted prosecutorial misconduct since there was "no basis in the evidence" to support the argument. Because there was evidence in the record to support the Government's assertion, Aleynikov's argument is meritless.

During its rebuttal summation, the Government stated the following:

> What were the circumstances at Teza? The defendant was hired there as a hot-shot computer programmer. He was very aggressive with his salary negotiations. *He even lied about how much money he was being paid at Goldman Sachs.* He told Mr. Malyshev that he was going to make 600 to $700,000 a year. You saw that in an email. We know from Adam Schlesinger that Aleynikov was making $400,000 a year including his bonus at Goldman Sachs.

(Emphasis supplied.) Aleynikov immediately objected and the Court instructed the jury, "Ladies and gentlemen, your recollection of the evidence will control." Aleynikov made no further application regarding this statement by the Government, either at the end of the Government's summation or at any other time during the trial.

There was sufficient evidence at trial for a rational juror to conclude that Aleynikov's statement in his email to Malyshev that he "was expecting [his] total comp [at Goldman Sachs] at the end of the year to be between 600 to $700,000" was false. When Aleynikov resigned from Goldman Sachs his salary was $400,000, reflecting the raise he had received only months earlier in response to the UBS offer. Aleynikov negotiated $1.2 million in compensation from Teza and told Goldman Sachs during his exit interview that his compensation at Teza would be almost three times his current compensation at Goldman Sachs. The jury was entitled to find that, given the recent raise to $400,000, it was unlikely that Aleynikov's compensation at the end of 2009 would be between $600,000 and $700,000, as he asserted in the email to Malyshev.

Aleynikov has also failed to make the substantial showing necessary to demonstrate that the Government's summation deprived him of a fair trial.

> [A] defendant who seeks to overturn his conviction based on alleged prosecutorial misconduct in summation bears a heavy burden. He must show more than that a particular summation comment was improper. He must show that the comment, when viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have substantially prejudiced him, depriving him of a fair trial.

*United States v. Farhane,* 634 F.3d 127, 167 (2d Cir.2011) (citation omitted). The Government's statement was grounded in the evidence presented at trial and thus did not "substantially prejudice" Aleynikov. Accordingly, Aleynikov's motion is denied.

## VI. Closure of the Courtroom

■ Aleynikov argues that the Court ordered closure of the courtroom for portions of the trial testimony without requiring the necessary precision in proffers from the Government as to which testimony required closure. Aleynikov further contends that the closure of the courtroom unduly constrained his ability to cross-examine witnesses at trial. For the following reasons, these arguments are without merit.

The Government gave notice of its intent to seek closure of the courtroom for certain portions of the testimony in its October 25, 2010 motion *in limine*. Although the Government identified broad categories of testimony that it thought would warrant closure of the courtroom in its October 25 motion, the Court made clear at a November 19 conference with the parties that it would require greater specificity from the Government as to the types of testimony that would warrant closure.

In a letter of November 29, the Government listed the witnesses and areas of testimony which it anticipated would require exclusion of the public. During an extended colloquy with the Court on November 30, the Government explained why *each* of the specific areas listed in the letter would require detailed testimony revealing the trade secrets of Goldman Sachs. Thus, the Court received a precise proffer from the Government during this colloquy as to each of the areas requiring closure; the Court did not require the Government to reiterate its arguments each time it sought closure thereafter. It did warn the Government, however, that if its examination of any witness during a period of closure exceeded the permission granted, that that would weigh heavily against the Government in its future applications for closure. Applying the standards set forth in *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), *Press–Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984), and *United States v. Alcantara*, 396 F.3d 189 (2d Cir.2005), on December 1 the Court approved closure for the items identified in the November 29 letter. The defendant did not protest that the Government's proffer was inadequate to support the Court's ruling.

Over the course of the trial, the courtroom was closed seven times during the testimony of six witnesses, typically for no longer than 20 minutes. On several of these occasions the Court required the Government to supplement its proffer. On none of these occasions did Aleynikov object that the particular closure was unwarranted or that it exceeded the scope of the Government's proffer and the Court's ruling on November 30 and December 1. Thus, Aleynikov's contention that the Court failed to elicit the need for closure with the requisite specificity is both untimely and groundless.

Aleynikov objects that the Court required him to conduct his cross-examination of Government witnesses regarding trade secrets in a manner that curtailed the effectiveness of his examinations, confused the jury, and heightened the jury's perception that Aleynikov had stolen trade secrets. The parties agreed to minimize the disruption and signaling that closure of the courtroom would cause to the jury by conducting the examination of topics requiring closure at the end of the Government's direct examination and the beginning of Aleynikov's cross-examination. *See United States v. Aleynikov*, No. 10 Cr. 96(DLC), 2010 WL 5158125 (S.D.N.Y. Dec. 14, 2010) (detailing sealing procedures). The Court gave Aleynikov the opportunity to propose alternative methods of dealing with the closure of the courtroom; it specifically asked the parties whether they had "any other procedure" that they wanted to propose, and Aleynikov answered in the negative. Indeed, after the Court finished outlining the procedure it proposed to follow, it again asked counsel if it could "have your cooperation" in following the procedure, and Aleynikov answered, "[y]ou can have my cooperation on everything, your Honor." Even now, Aleynikov describes no other procedure that would have been preferable. Thus, Aleynikov

has waived any objection to the manner in which closure of the courtroom was accomplished by the Court.

At the conclusion of the trial, the Court requested that the parties review the sealed portion of the transcript and identify any passages that could be unsealed and placed in the public record. On December 13, after the trial had concluded, the Government moved to unseal several portions of the trial transcript. Aleynikov consented to this request, and the Court approved the unsealing in its December 14 Opinion. *Id.* Indeed, by Order of December 15 the Court identified further passages as candidates for unsealing; these passages were ultimately unsealed with the parties' consent. At no point did Aleynikov propose that additional passages be unsealed.

The procedure adopted by the Court in an effort to both protect the public's constitutional right of access to the trial and to avoid signaling to the jury that some of the testimony was sensitive required counsel to concentrate their examinations about trade secrets at the beginning and end of their examination of a witness. While this procedure was not perfect—and some passages of the trial transcript were ultimately unsealed after the trial concluded—the procedure generally worked well and there is no reason to find either that any constitutional rights were materially affected or that the jury was prejudiced by the procedure.

## VII. Judicial Impropriety

Finally, Aleynikov argues that the Court exceeded the bounds of judicial propriety in three ways: (1) by sustaining objections from the Government without explaining the basis for its rulings; (2) by denying Aleynikov's three requests for sidebars with the Court while granting the Government's one request for a sidebar; and (3) by refusing to allow Aleynikov to display

during his summation a page of the trial transcript containing an objection. For the following reasons, Aleynikov's arguments are unavailing and the motion is denied.

### A. Objections

■ Aleynikov argues that the Court's practice of not allowing speaking objections prejudiced him. He explains that he had no way of knowing what was improper in his questioning and was therefore deprived of an opportunity to correct any deficiency.

District courts are given broad discretion to manage trial proceedings. "As to some matters relating to the management of proceedings before the court, such as the introduction of evidence and the regulation of the course and scope of examination of witnesses, a district court's discretion is broad indeed." *United States v. Local 1804–1, Int'l Longshoremen's Ass'n, AFL–CIO*, 44 F.3d 1091, 1095 (2d Cir. 1995).

The parties were advised in advance of the first witness taking the stand that the Court did not favor speaking objections. On November 29, the Court reminded the parties that it does not favor speaking objections and explained that it would elicit further explanation from counsel as to the basis for an objection if needed.

Only rarely during the trial did Aleynikov express uncertainty about the grounds on which an objection had been sustained. On November 30, Aleynikov advised the Court that he "would like to be heard after on my objections as to the reasons why they are being sustained." The Court responded that it would provide the basis for each and every sustained objection during the breaks in trial testimony if Aleynikov so desired, and proceeded to provide an explanation for the rulings that Aleynikov

82

identified. The Court further advised Aleynikov that it would be available at the following times during each trial day to discuss the basis for its evidentiary rulings: at 9 a.m.; during mid-morning and mid-afternoon breaks; during the lunch break; and after the end of the trial day at 5 p.m. The Court also informed the parties that it would inquire as to whether there were any questions from counsel at the start of each break.

On only a few other occasions did Aleynikov inquire as to the reason an objection had been sustained. Each time, the Court explained the ruling.[12] At no point during the trial did Aleynikov express any disagreement with these explanations. Moreover, in this motion Aleynikov does not identify a single objection that was improperly sustained or a legitimate line of questioning that he was prevented from pursuing because an objection was improperly sustained and he was given no explanation for the basis of the evidentiary ruling.

In sum, Aleynikov was given ample opportunity to learn the specific ground on which objections were sustained, and he has identified no prejudice that he suffered as a result of the bar on speaking objections. Moreover, because the Court did not allow either party to make speaking objections, this practice conveyed no partiality toward either side to the jury.

B. Sidebars

■ Aleynikov contends that the Court's denial of his three requests for sidebars prejudiced the defense because it made it appear to the jury that Aleynikov was acting improperly in requesting a sidebar. Aleynikov has not shown that he suffered any prejudice at trial from the inability to participate in a sidebar.

The Court explained its policy on sidebars at a pretrial conference on November 19. The Court observed,

I don't encourage side bars. This may be a case that will test that rule. But generally speaking, I expect you to anticipate issues that are going to arise and to talk about them with each other, evidentiary issues, legal issues, things that need discussion and exploration with the Court. And to do it outside the jury's time so that they're hearing testimony from 9:30 to 5.

To provide ample opportunity for legal argument outside the presence of the jury, the Court and the parties met at the beginning of each trial day for half an hour before the jury began to hear evidence at 9:30 a.m., as well as during breaks in the testimony, and at the end of the trial day. The policy against sidebars applied equally to both parties and was the Court's customary practice.

Although aware of the Court's practice, Aleynikov requested a sidebar three times during the course of the trial; the requests were denied. Aleynikov requested a sidebar during his cross examination of Yanagisawa, and during the direct testimony of both Schlesinger and Special Agent Candace Hunter. Aleynikov did not offer any explanation at trial and has offered none now of how the absence of a sidebar on those three occasions interfered with the proper presentation of trial testimony. As already noted, there was ample opportunity during the trial to discuss evidentiary and legal issues without unnecessarily disrupting the presentation of the evidence to the jury.

C. Display of Stricken Question

Finally, Aleynikov challenges the Court's refusal to allow him to display

12. Where appropriate during the testimony, the Court advised counsel that an objection was being sustained as to form, so that the attorney could promptly cure the deficiency.

pages of the transcript with counsel's objections during his summation. He complains that the ruling prevented him from displaying to the jury one page with critical testimony from Walker.

During his summation, Aleynikov displayed for the jury a portion of his examination of Schlesinger and read from it, emphasizing the point at which the Government had made an objection. The transcript page included the following passage:

> Q. Did you become personally familiar with Mr. Aleynikov's character during your time of working with him between 2007 and 2009?
>
> Objection,
>
> Overruled.
>
> A. I had become somewhat friendly with Mr. Aleynikov.

Shortly thereafter, the following colloquy occurred. The Court said, "Excuse me, counsel. I just want to put you on notice, no more pages from a transcript with objections reflected. Thank you." Aleynikov responded, "I apologize. I thought if the objection was overruled it was all right to do it." The Court responded, "No. As I have told the jury all along, statements by counsel are not evidence; they are not part of the evidentiary record here; they have nothing to do with your deliberations." *See United States v. Barrow*, 400 F.3d 109, 119 (2d Cir.2005) (approving instruction to jury that statements by counsel are not evidence).

At no point following his summation did defense counsel take further issue with the Court's ruling or suggest that it had interfered in any way with the presentation of the remainder of his summation. In particular, Aleynikov did not indicate that the ruling had interfered in any way with his discussion of Walker's testimony. In fact, during his summation Aleynikov referred to Walker's testimony regarding Goldman Sachs' efforts to segregate open source code from proprietary source code and suggested that Goldman Sachs had not been successful in those efforts.

If the jury had asked for testimony to be provided to it during summations, and the parties had agreed that transcript pages could be provided to the jury, any objections by counsel or colloquy with the Court would have been redacted from those pages. Contrary to Aleynikov's suggestion, the removal of colloquy and objections, whether sustained or overruled, is customary practice. After all, the issue for the jury is not whether either the Government or Aleynikov objected to or offered any particular piece of testimony, but whether on the basis of all the evidence, or the lack of evidence, the Government has proven Aleynikov's guilt beyond a reasonable doubt. There was no proper purpose in directing the jury's attention to an objection, and Aleynikov has identified none in this motion. Accordingly, this ground for the motion is denied as well.

## CONCLUSION

Aleynikov's December 23, 2010 motion to set aside the verdict and to dismiss the Indictment, or in the alternative, for a new trial, is denied.

SO ORDERED: